JOHN WALLIS ET AL., Appellants, v. BOARD OF SUPERVISORS OF HARRISON COUNTY ET AL., Appellees.

**Drainage:** ESTABLISHMENT OF DISTRICT: OBJECTIONS: DAMAGES. Slight benefit to property owners, while a matter for consideration in the assessment of benefits, is not ground for restraining the entire project: Nor will an establishment of the district prevent them from claiming damages for the diversion of a watercourse, in so far as additional water is thrown on their land.

**Same.** That property owners objecting to the establishment of a drainage district have a vested right in a levee therein is not ground for abandoning the project; as such right is subject to the purposes of drainage as much as the land itself.

**Same:** INTEREST OF ENGINEER: DISQUALIFICATION. The fact that the engineer appointed to establish a drainage district had a preconceived idea concerning the project which he recommended, while a matter proper for the appointing board to consider in determining his disinterestedness, did not necessarily show that he was disqualified by reason of his interest therein, especially where it appeared that his idea was the correct one.

*Appeal from Harrison District Court.*—HON. O. D. WHEELER, Judge.

SATURDAY, OCTOBER 21, 1911.

PROCEEDING for the establishment of a drainage district. The district was established by order of the board of supervisors of Harrison county. Upon appeal to the district court such order was confirmed. From the order of the district court, the objectors have appealed. *Affirmed.*

*Mayne & Hazelton,* for appellants.

*Tinley & Mitchell, C. W. Kellogg, S. H. Cochran,* and *L. W. Fallon,* for appellees.

EVANS, J.—The district in question is known in the record as "The Soldier Valley Drainage District." The Soldier river runs westerly toward the Missouri as its final outlet. The principal part of its course runs through the highlands which form the east bank of the Missouri river bottom. It has a watershed of three hundred and eighty square miles. It throws its waters upon the Missouri bottom at the foot of the bluffs at a point nearly seven miles distant from the river. For want of a current and

a well-defined channel, these waters spread over the bottom and follow a meandering course in a southwesterly direction, and find their final outlet into the Missouri at a distance of eighteen or twenty miles from the point of discharge at the foot of the bluffs. The area of the district involved is about twelve miles long by six miles wide. The principal engineering problem presented is to carry the volume of water that comes down from the hills in a direct course across the bottom to the river, and to keep the same confined in such short course within the walls of the ditch and its dikes. This problem being solved, and the surrounding bottom lands being relieved of this great overflow, the method of draining the surplus rainfall becomes a minor problem, and is provided for by auxiliary drains. The fall available, along the surface of the ground is very slight; there being but little difference in the elevation of the land at different points. The plan adopted proposes a ditch and dikes across the bottoms by the shortest practicable route, being six and five-tenths miles. The objectors are landowners, and are located in one particular part of the proposed district lying north of the ditch and in the westerly part of the district. It so happens that this particular locality has been protected against an overflow of the Soldier river by an artificial dike about two feet high, which was constructed more than fifty years ago, and has been maintained ever since. The right to the maintenance of this dike as a part of the local drainage system was involved and sustained in the recent case of *Loveless v. Ruffcorn*, 143 Iowa, 221. The lands which will be principally benefited, as assumed, are those which lie to the east of such dike, and south of the proposed ditch. Such dike is known in the record as the "Noyes Levee" and the "Loveless Levee." A railroad grade also forms a part of the protection of the objector's lands. The lands lying within this protected area have been farmed with success, and are much more valuable than the other

bottom lands lying outside of the protection of the dike. The record is very voluminous. The counsel for the respective parties present to us a very succinct statement of the salient facts of the case. We can not do better by way of a statement of the case than to avail ourselves of these statements of counsel. We quote, therefore, from appellant's brief:

*Statement of Facts.*—A great many of the facts in this case are either undisputed or established by the overwhelming preponderance of the evidence, and the following facts are, as appellant contends, substantially beyond dispute: The Soldier river emerges from the bluffs a little below the town of Orson and the proposed Soldier Valley drainage ditch in controversy in this action, which will hereafter be called the Wattles ditch, starts a little over a mile above that place in the northwest corner of section 34, thence running in a southwesterly direction following the general course of the Soldier river to a point a little over a mile below where it emerges from the hills. From thence it turns westerly, almost at right angles to the course of natural drainage, running slightly south of west for about three miles, thence making another turn and bearing southwest for a little less than two miles, until it enters the Missouri river, the last stage being down in what is known as the old bed of Dry Lake. The Soldier river as it now flows runs in a winding course almost south after it passes the town of Orson for about seven miles, thence it bears southwest under the Chicago & Northwestern Railway track; the present current of the Soldier river crossing under the Northwestern Railway track about seven miles south of the crossing of the Wattles ditch under the said railway. The town of Mondamin is located on the railway about midway between the crossing of the Wattles ditch and the crossing of the present Soldier river.

The Loveless and Noyes Levee, as a road runs from the railroad track east of the center of section 13 and in a northeasterly direction, joining the highland north of the proposed Wattles ditch. This levee, together with the strip of higher land north of it and the railway grades and higher land south of it running down, almost to the present crossing of the Soldier river, forms the so-called high line

or watershed which marks the western boundary of the
Soldier River Valley proper. A large proportion of the
land east of this high line is overflowed to a greater or less
extent by the flood waters of the Soldier river. The land
west of this high line, and down to the vicinity of where
the Soldier river now runs, is not affected in any way by
the flood waters of the Soldier river. There is some evi-
dence that part of the land in the southern part of this
district in the vicinity of Willow, Linn, and Burcham's
Lake, was on one or two occasions affected slightly by the
backwater from the Soldier river in times of extreme flood,
but it is shown without question by all of the evidence that
substantially none of the land north of the township line
is ever affected to the slightest degree by the overflow of
the Soldier river. This land in the territory west of the
high line or watershed slopes to the south and west, and
drains into the Missouri river. The land east of the
watershed or high line slopes east and south and drains
into the Soldier river; and that, while this so-called high
line or watershed is not many feet higher than the sur-
rounding country, it constitutes as clear cut and distinct a
watershed as would a range of hills, and that it has al-
ways constituted a complete and absolute protection to the
land west of it from the overflow waters of the Soldier
river.

The evidence shows: That the Soldier river as it
now runs after leaving the hills has at all times within the
memory of the witnesses been a stream without any very
high or clearly-defined banks. That during the last twenty
years at numerous places along its course trees or other
obstructions had been put in the stream, and the banks
were cut for the purpose of causing it to overflow and fill
up the surrounding land with sediment. By reason of
this fact and the fact that the river naturally bears a con-
siderable amount of silt at flood time, its channel has
been caused to fill up to such an extent that a very slight
raise will make it overflow. The land near the river has
by reason of the deposit of sediment become generally
higher than the land further back, and this fact, together
with the general filling up of the channel, causes the water
to overflow and extend, in times of ordinary flood, prac-
tically from the high line to the bluffs or across the entire

Soldier Valley.   The worst condition of the river exists from a short distance south of Orson and extending south for a distance of about four miles.   Below that the channel is less filled up and deeper, and carries the water better.

It appears without controversy in the evidence that substantially all of the land in the Soldier Valley east of the high line and Chicago & Northwestern Railroad and south of the proposed line of the Wattles ditch is subject to frequent overflow, and is practically worthless for that reason.   It shows that substantially all of the land west of the high line and railroad and extending down some distance below Burcham's Lake is good farm land worth from $75 to $125 an acre, and is not subject to overflow, and raises a crop every year.   It also appears from the evidence of the same witnesses above cited that east of the railroad track and between that and the elbow or bend the line of the proposed Wattles ditch marks the north boundary of the overflow land.

We quote from appellee's brief as follows:

The proposed Soldier Valley drainage district, the location of the controversy involved in this action, lies on Missouri river bottom in Harrison county, Iowa, and constitutes a tract of land lying between the Missouri river on the west and the high bluffs on the east.   This entire body of land, approximately six miles in width by twelve miles in length, is the ordinary low bottom land that is found along the Missouri river.   There is scarcely four feet difference in the elevation of any of it, and this difference is represented by a gentle rise toward the Missouri river and toward the bluffs from a central line.   Extending from north to south approximately through the center of this tract of land is the right of way of the Chicago & Northwestern Railway Company or what is known as its Council Bluffs & Sioux City line.   The town of Mondamin is located approximately in the center of this tract, and from Mondamin extends another line of railroad owned by the Chicago & Northwestern Railway Company toward the north and parallel to its Sioux City line for a distance of about two miles, and thence northeasterly through the proposed drainage district through the town of Orson, located approximately at the northeast corner of the pro-

posed district. Lying along the entire easterly side of the
proposed district are precipitous bluffs, rising abruptly
from the bottom to a height of several hundred feet. These
bluffs are rough and straggly, with ravines forming natural
watercourses leading through them to the bottom lands at
several points. At the northeast corner of the district is
a deep ravine about one-half mile in width, from which the
Soldier river enters from the high lands to the bottoms.
The line of bluffs forming the westerly or northerly side
of this ravine extends from this point to the west along the
northerly side of the district to within two miles of the
Missouri river. These bluffs are likewise precipitous, ris-
ing abruptly from the bottom land, and having several
ravines forming natural watersheds and the source of
creeks, entering upon the bottom land. Exhibit 22, being
the plat prepared by J. S. Wattles, the engineer appointed
by the board of supervisors to report upon the drainage
propositions, shows in detail the elevation of each tract of
land, and all lakes, ponds, sloughs, creeks, and the Soldier
river. The so-called Dry Lake shown upon Exhibit 22 is
evidently an abandoned bed of the Missouri river, and is
presented by the government survey as a meandered lake.
It is about a quarter of a mile wide, and from four to
five miles in length. Near its southerly end it connects
with the present course of the Missouri river. Its banks
in many places are abrupt, and, excepting in times of high
water, heavy rains, and flooded seasons, it is dry. On the
west side of the railway tracks above referred to, and in
the northerly part of the proposed district, is another
meandered lake known as Round Lake. This lake takes
its name from its shape, and is approximately one mile
in diameter. A considerable portion of it in dry seasons
is free from water. As shown by Exhibit No. 22, there
is found a chain of lakes, swales, and sloughs south of
the Round Lake to the southerly part of the district.

The Soldier river enters upon the Missouri river bot-
tom at the northeast corner of the district. It forms the
drainage for about three hundred and eighty square miles
of high lands. All of this territory drains toward the bed
of the Soldier river in the hills by steep bluffs and the fall
of the river from its source to the bottom land is very
great—from five to twelve feet to the mile. When the

course of the river reaches the bottom land at the north-east corner of the district, it travels from thence by many turns and bends southwesterly through this bottom land, and its course has a measurement, upon the bottoms, of from eighteen to twenty miles, but measuring its meanderings about fifty-seven miles. This bottom land through which the river flows is practically level; the fall being approximately one and two-tenths feet to the mile. The situation then presenting itself for drainage solution requires the caring for a stream draining three hundred and eighty square miles of territory, reaching the bottom land with a fall of greater than five feet per mile, then suddenly being required to accommodate itself to a bed having a fall of one and two-tenths feet to the mile. The territory drained by this river is largely cultivated land; the result being that the river carries large quantities of earth in solution, and, when it reaches the bottom coming at such a velocity as that the silt is readily carried in solution, it is suddenly checked by reason of the reduced grade and the corresponding reduction of velocity causing it to spread at great width over the bottoms and then the velocity is so reduced that the sediment is deposited. The testimony shows without contradiction that even a very small rainfall will produce such a volume of water to be carried by this stream that, when it reaches the bottom land, it necessarily floods that portion of it lying east of the railway tracks, comprising a territory of about three miles in width by more than twelve miles in length. The waters are only prevented from spreading over the entire district by reason of the railway dikes, and, when the rainfall is such that it may be termed an ordinary rain, flooding is so extensive that it crosses the railways through the different openings, and floods the lowlands west of the railways.

The problem presented for the successful drainage of this district requires that by some scheme the ditch shall be so constructed to receive the flood waters of the Soldier at the point where it enters upon the bottom land and carry these waters to the Missouri river as an outlet, thereby preventing the spreading of the flood waters over the bottom land of the district. This is the prime factor for consideration. The other drainage problems are but

the ordinary drainage problems confronting the officers respecting any district. Along the entire easterly and along part of the northerly side of the district are precipitous hills that we have above referred to. These form a watershed draining a considerable area, and throw a considerable quantity of water upon the bottom lands without the formation of any creek or stream. From the hills on the north rise one or two small creeks that empty upon the bottom land. From the hills on the east rise two creeks emptying upon the bottom land. One of these is known as Steer creek, and is the source of considerable trouble. It enters the bottom land at approximately the center of section 27, township 80, and the tract of land consisting of several sections extending westerly and southerly upon the bottom is known as Nelson slough. On practically every forty-acre tract of land in the entire district will be found low places of more or less extent; in some instances being sloughs of considerable area and in others simply low spots of small consequence. All of these are seriously affected by the ordinary rainfall, and use for agricultural purposes prevented even when we eliminate the floods from Soldier river.

The trial court filed a written opinion in the case. It is comprehensive and thorough in its consideration of the entire record. The following findings of facts and conclusions of the law appear therein:

(1) That the Soldier river drains approximately three hundred and eighty square miles of territory, having its source in Monona county, and flowing in a southwesterly direction through the western portion of Harrison county and emptying into the Missouri river in Cincinnati township about four miles southwest of the town of Modale. It emerges from the hills and flows out upon the Missouri river bottom near the town of Orson, and thence pursues a tortuous course in a southerly and southwesterly direction down and across said bottom to its mouth. In its upper course it has a current of some swiftness, and it carries a large amount of silt in times of high water. When it reaches the bottom lands, the fall is reduced to such a degree that a large amount of the silt is deposited.

The bed of the stream has been raised above the surrounding territory, and even in times of ordinary freshet it overflows its banks and inundates the surrounding territory. The banks and bed of the stream having thus become so much higher than the adjacent lands through this deposit of silt, the waters, which are thus poured out upon the lands adjacent, have little or no opportunity to get back into the channel, and thus render large tracts of land worthless, which, if drained, would be fertile and productive. By reason of such frequent inundations large tracts of land are made wet and swamp, and are not only unproductive, but are a menace to the health and comfort of the community. That by reason of the conditions aforesaid some system of drainage whereby such lands may be drained and such frequent inundations can be prevented is a matter of public necessity and utility and conducive to the public health, convenience, and welfare.

(2) That the natural course of drainage of surface and overflow water from the point where said stream emerges from the hills is toward the southwest, and in the general direction of the flow of said stream. In times of high water, however, the whole of said bottom land east of the Chicago & Northwestern Railway line is inundated, and but for the erection of a levee in section 12—70—45, which is known as the 'Loveless Levee,' and for the embankments of the said railway company some considerable portion of said overflow would find its way westward from said point of emergence as aforesaid, through said section 12 and westward to the Missouri river.

(3) That the whole of the Missouri river bottom land lying west of the Soldier and between said stream and the Missouri river is of a very level character, there being scarcely more than four feet difference in elevation between the highest and the lowest upon any parallel of latitude. The lowest lands lying in said tract are those situated in a strip practically parallel with the present channel of the Soldier, and whose eastern boundary is about one-half mile west thereof and whose western boundary is about one and one-half miles west of said channel. There are also several lakes of some consequence in the southwestern portion of the proposed drainage district which are proper subjects of drainage. The low tract above mentioned is in general

lower than that land lying along the Missouri river directly west of it, and it is this low tract which suffers the effects of every overflow, no matter how slight it may be. Being lower than the land lying west of it, it has no outlet toward the Missouri, and, being lower than the banks of the Soldier, it can not be readily drained back into the Soldier.

(4) That on August 10, 1909, a petition was filed in the auditor's office of this county, signed by a large number of landowners whose lands are embraced within the drainage district in question, praying the establishment of a drainage ditch or ditches to divert the Soldier river and to drain the lands of the petitioners, and other lands located in the townships therein named. J. S. Wattles, Esq., was, by the board of supervisors, appointed as engineer to make a survey and report upon the feasibility of the project and to devise a system of proposed drainage and to recommend the extent of the proposed drainage district. On September 13, 1909, Mr. Wattles filed a report wherein he recommended a system of drainage as follows:

First. The construction of a channel to divert the waters of the Soldier river to be known as the 'Soldier Cut-Off,' which would take the waters of said stream where the same crosses the south line of the N. W. ¼ of the N. W. ¼ of section 34—81—44, and carry the same in a southwesterly direction and empty the same into the Missouri river near the center of the S. E. ¼ of section 15—80—45. This channel would be six and sixty-six one-hundredths miles in length, from where it intercepts the Soldier river to station 214, a point near where said proposed ditch crosses the north line of section 18—80—44, said channel is to be thirty-five feet in width at the bottom, slope of side one to one and berms fifteen feet in width. The fall from the Soldier to Station 214 is about three feet per mile and the fall from Station 214 to the Missouri river about one and two-tenths feet per mile. This channel is to be constructed for the purpose of carrying the waters of the Soldier river.

Second. The second improvement contemplated by the plan of Mr. Wattles is the extension and enlargement of the 'Spooner Ditch.' This is an old ditch running south

along the line between sections 29 and 30, 31, and 32, in township 80—44, and sections 5, 6, 7, and 8, in township 79—44, emptying into the old Soldier channel. Mr. Wattles proposes to construct a concrete spillway at or near Station 214 of the Soldier cut-off for the purpose of permitting the excess of water in times of unusual flood to escape out of the cut-off channel and thus avoid overloading it in time of such floods. From the spillway he proposes to construct a ditch south and southwest to connect with the north end of the Spooner ditch and by the construction of this ditch and the enlargement of the Spooner ditch itself he proposes to take care of this overflow in times of excessive flood. This ditch is also expected to serve as a drainage ditch to take care of surface water, and to also furnish an outlet for tile drainage in the territory east of the railway tracks. From the spillway to the old Spooner ditch it is proposed to construct a ditch twelve feet wide at the bottom; and the old ditch is to be enlarged to sixteen feet at the bottom. The length of the new part would be three and one-tenth miles, and of the old portion three and six-tenths miles.

Third. The third improvement contemplated in the plan in question is what is known as the 'West Soldier ditch,' commencing near the northwest corner of the N. E. 1/4 of the S. W. 1/4 of section 9—80—44, and running south four and thirty-five one-hundredths miles to a connection with the Nelson ditch in the N. E. 1/4 of the S. W. 1/4 of section 4—79—44. This ditch is planned to be eight feet on the bottom, and is expected to take care of the surface water which may fall on the land east of the old channel of the Soldier, and such overflow from the Soldier itself as finds its way down on that side of the old channel.

Fourth. The fourth improvement planned is called the 'West Soldier ditch,' and commences at the center of section 29—80—44 and runs south to a junction with the Nelson ditch in section 5—79—44, a distance of two and one-half miles. The bottom width of this ditch is six feet, and it will serve in the main for an outlet for tile drainage.

Fifth. The fifth improvement planned is known as the 'Nelson ditch,' commencing near the quarter section

corner between sections 33 and 34—80—44, and running in a southwesterly direction two and one-fourth miles to connect with the old channel of the Soldier river in the S. ½ of section 5—79—44. The bottom width of this ditch as proposed is eight feet. A portion of this ditch is already constructed, and will be enlarged.

Sixth. The sixth improvement planned is called the 'Burcham ditch,' and commencing in the N. E. ¼ of sections 26—80—45 it will run through a low section of the valley in a southerly direction through Burcham Lake, Willow Lake, and Lynn Lake, and empty into the old bed of the Soldier in section 14—79—45. It would be about five miles in length, and the bottom as excavated would be six feet.

Seventh. The part known as 'Pratt Lake ditch' is the seventh on the plan in question, and it consists of a ditch six feet wide at the bottom, running from a point near the quarter section corner between sections 3 and 10 —79—45, and running southeasterly through Pratt Lake and discharging into the Soldier channel in S. E. ¼ of N. E. ¼ of section 14—79—45.

To this report of Mr. Wattles, the appellants, on October 26, 1909, filed written objections, and the matter came on for hearing before the board of supervisors, and on December 3, 1909, the said board found said petition was sufficient, that the establishment of the drainage district and the construction of the ditches as proposed by Mr. Wattles under the petition were matters of public necessity and utility, and ordered that said drainage district be established and said ditches constructed.

From this finding and order of the board of supervisors the appellants have appealed to this court. The objections filed before the board of supervisors, and upon which this appeal is based, and which objections alone this court can consider, are as follows:

(1) That the lands of the objectors within the proposed drainage district are not benefited by the establishment and construction of the improvements, that such lands are not subject to overflow from the Soldier, and that such lands should not have been included within the drainage district.

(2) That the Soldier river cut-off, which is the princi-

pal improvement proposed by the plan of drainage in question is not located as required by law along the line of natural drainage, but is located directly across the line thereof. That it is practicable to construct a drainage channel in the direction of the line of natural drainage, and such channel can be constructed more economically than the one proposed. That a channel constructed in the line of natural drainage can be so planned as to cross the lines of the railway company in the place where the natural waterway crosses the same; but that the proposed cut-off crosses the same in two places, in neither of which is there a waterway.

(3) That the board of supervisors were estopped from the establishment of the drainage district and the establishment of the drainage system in question by various records and decrees prior to the hearing at the time in question.

(4) That chapter 68 of the Laws of the Thirtieth General Assembly and chapter 118 of the Acts of the Thirty-Third General Assembly are unconstitutional, null, and void.

(5) That the engineer appointed by the board of supervisors was not a competent and disinterested engineer as required by the law.

With reference to these objections the court finds as follows:

(1) That, while there are some tracts included in the drainage district which are not subject to overflow by the waters of the Soldier river, the court is not warranted in finding that they are not at least in some slight degree benefited in the matter of surroundings and environment by the improvement of those lands which have heretofore been inundated and the crops upon which have been drowned out to so great an extent for many years. The court will be warranted in assuming that, when benefits are assessed, those lands which are but slightly benefited will be but slightly burdened by such assessments, and that those which are to receive greater benefit will bear the greater portion of the burden of the improvement.

(2) That, while the evidence shows that the proposed Soldier cut-off, as planned by Mr. Wattles, does not follow the line of natural drainage, it is more practical and

economical than would be the construction of a drainage channel southward along the line of natural drainage, for the following reasons:

(a) It will be much shorter. The proposed channel is but six and six-tenths miles long, while a channel southward can not be so constructed as to carry the waters of the Soldier river to the Missouri river in less than sixteen miles. The advantages of the shortest channel are manifold. In the first place, flood waters are carried out through the channel in a much shorter period of time and the lands above so much sooner relieved. In the second place, the Soldier is a great silt-bearing stream. Whenever the flow of silt-bearing water is checked, the deposit of silt begins. No plan for a channel can be devised for the waters of the Soldier which does not have an upper portion of greater fall than the lower portion. The Wattles plan contemplates an upper reach of two and six-tenths miles which will have a fall of three and seventeen one-hundredths feet per mile, and a lower reach of four miles with a fall of one and twenty-three one-hundredths feet per mile. The plan for the channel along the line of natural drainage towards the south and southwest contemplates a ditch about sixteen miles in length, five and five-tenths of which would have a fall of three and seventeen one-hundredths feet per mile, and the remaining portion a fall of one and twenty-three one-hundredths feet per mile. It does not require any argument to convince one that the short stream will carry more silt into the Missouri river than the longer one. This means that the shorter will keep more free from the accumulation of silt, and will require less attention to keep it cleaned out. In other words, such a channel will be much more apt to keep itself open, and will not as readily clog or choke up with mud and debris. In the third place, the shorter the channel the less will be the opportunity for the stream to break over its banks or levees in times of flood. It not only has less length of bank to be guarded, but there is this added element: The upper portion of the channel having a greater fall per mile will have a greater current and will deliver the water to the lower portion with a greater degree of swiftness than is maintained in the lower channel. If the lower portion of the channel be long and the stream

therein sluggish, there is greater danger of the water piling up in the lower reaches and bursting over its banks than if the lower reach is short. If the lower reach of the channel is short, the water coming down from above with greater swiftness will accelerate the speed of the water in the lower portion of the channel and hasten it on its way out through the mouth. In the fourth place, the shorter channel will cost less to construct and less to maintain.

(b) The cost of the single channel southward in the line of natural drainage would be equal to or more than the entire cost of Wattles' plan. The plan adopted not only provides for diverting the water of the Soldier and carrying it to an outlet, but it also provides for a comprehensive system of surface drainage which will furnish outlets for tile drains in many thousands of acres of what ought to be exceedingly fertile lands. The plans proposed by the appellants provide for a channel for the Soldier only. Whatever surface drainage is to be thereafter provided would entail additional expense, even if possible for such surface drainage to be effectually accomplished— a matter of very grave doubt.

(c) Owing to the low character of a considerable portion of the valley through which the channel proposed by the appellants must be constructed, it is impossible to construct a channel of much depth and much of the flood waters must necessarily be carried above the natural surface of the ground confined only by levees or embankments. For a distance of six or eight miles most of the water in times of ordinary flood must be carried between levees several feet above the surrounding lands. Such a plan would not be desirable in the case of a stream like the river in question, if it could in any manner be avoided.

(d) The channel down the line of natural drainage, being necessarily shallow and flanked by high levees, would not readily admit of surface drainage from the adjacent lands and tile drainage would scarcely be possible. Moreover, on account of the tendency to deposit silt, as hereinbefore referred to, the bed of the channel would gradually grow higher until surface drainage would be impossible.

(e) The cut-off, being upon higher ground, can be cut more deeply into the solid earth, and it does not require

much of its flood waters to be carried by levees along its sides.

(f) Danger of overflow will be limited to the south levee or embankment of the cut-off, and the plan provides for a levee of greater strength on that side. Overflow to the north can not do much serious damage, as the ground is higher to the north, and the water must necessarily find its way back into the 'cut-off.' Under the other plan, both levees would be subject to overflow, and both must be guarded.

(g) With the ordinary waters of the Soldier river cared for and taken out of this low, flat area, the matter of drainage under usual conditions is easily solved.

(3) The order of the district court at the October term, 1906, does not constitute an adjudication of the questions herein involved, for the reason that no final judgment was entered; the court merely referring the matter back to the board for further investigation. The decree of January, 1909, is not an adjudication of the matters herein, for the reason that such decree is based upon proceedings had before the Act of the Thirty-Third General Assembly was in effect, and such decree is based upon the law as it then existed, and is based upon the fact that the law, as it then existed, required the improvement to be constructed in the line of natural drainage. This rule has been changed by chapter 118 of the Acts of the Thirty-Third General Assembly. The action of the board of supervisors in dismissing the petition on June 10, 1907, would not constitute an adjudication for the reason that such act of the said board was a legislative act, and not judicial.

(4) Provision is made in said acts for payment of damages suffered by a property owner by reason of the diversion of a stream in the flow of which he has an interest, and said acts are not unconstitutional by reason of any failure to provide compensation for property taken. That said acts provide a tribunal before which the question of whether or not certain lands are benefited by the improvement is determined, and further provide for notice upon the property owner prior to such adjudication. Such tribunal has the authority and power to determine whether or not such land will be benefited by the improvement,

and whether or not it shall be included in the drainage district. When that fact has been once determined by such tribunal and upon notice to the property owner and opportunity to be heard before such tribunal upon his part, it constitutes an adjudication of the fact that such property will be benefited, and he can not claim that it is not benefited. Such acts, therefore, are not unconstitutional because they contain the provision that the property owner can not be heard to say, on appeal to the district court from the assessment of benefits, that his property has not been benefited by the improvement. The court therefore holds that such acts are not unconstitutional as claimed by the appellants.

(5) It is claimed in the next place that the engineer appointed by the board of supervisors to draft the plan and make the survey was not a competent and disinterested engineer as required by the statute; but there is nothing in the evidence to sustain a charge of incompetency or interest such as to disqualify him from serving.

We have read the large record with much care, and find ourselves in substantial agreement with the trial court.

Assuming it to be true that the benefits to the objectors are comparatively slight, this is a fact to be taken account of in the regular assessment of benefits. So far as the diversion of the stream is concerned, no question of riparian rights is involved. No riparian owner is objecting.

1. DRAINAGE:
establishment
of district:
objections:
damages.

Nor is it true that the objectors are prevented from claiming damages for the diversion of the watercourse, in so far as such new watercourse is thrown upon them. We are impressed from the record that the objections of the objectors are based to a large extent upon their apprehensions that the project may prove to be an engineering failure, and that the banks and dikes may not restrain the water, and that the water thus brought into their neighborhood may escape from the inclosure and flood their lands. Every engineering project presents to some degree a pos-

sibility of its failure; and, even if the engineering plan be true and sound, the actual construction may not be true to the plan. Negligence may intervene at many points. But apprehensions of this kind would effectually block all engineering projects, and the court must guard against taking them too seriously.

It is also urged that the objectors have a vested right in the protection of the Noyes levee, and that their right in this respect has been adjudicated (*Loveless v. Ruffcorn,*
2. SAME.     *supra*), and that this project is an interference with such adjudication. But the right of the objectors to the Noyes levee and its protection is no greater than their right and title to their lands; and, as their lands may be taken in such a proceeding as this, we see no reason why their right in the levee may not be subordinated in the same manner to the higher public right.

We will not undertake a discussion of the relative merits of the engineering plan adopted by the board of supervisors and that presented by the objectors. The relative merit of the plans is largely a matter of expert opinion. It is sufficient to say that the plan adopted appears to us, as it did to the trial court, the more feasible and practicable of the two. That it involves some menace to the appellants must be conceded. It is perhaps true, also, that the larger benefit from its operation will be obtained by the lands lying to the east and south. But this does not furnish a sufficient reason why the objectors may forbid it. The Biblical philosophy that "no man liveth unto himself" has much illustration incident to the establishment of drainage districts, and nowhere more, perhaps, than when such district is established in the flats of the Missouri.

The point is formally made that chapter 68, Acts Thirtieth General Assembly, and chapter 118, of Acts Thirty-Third General Assembly, providing for the diver-

sion of a stream from its natural course, are unconstitutional. The point, however, is not argued, and we will not undertake any discussion of it.

Lastly, it is urged that the engineer, Wattles, was not disinterested at the time of his appointment by the board of supervisors. It is not claimed that he had any financial interest in the project; or in the lands involved, but it is claimed that he had on two or three previous occasions recommended the same project to the board, and that he was therefore prejudiced in favor thereof. We are not prepared to say but that a preconceived and set idea might be such as to create prejudice in the mind of an engineer. It would certainly be a proper circumstance for the consideration of the appointing board, but it is evident that the force of such circumstance would depend very much, if not wholly, upon the question whether such preconceived idea was a correct one or not. A man may form an incorrect idea and escape from it later with proper information. But there is no such escape for the man with a correct idea. Without attempting to lay down any hard and fast rule upon the question as to what constitutes disinterestedness in an engineer, we think there is no fair ground of complaint in this case.

Upon the whole case, we fully agree with the conclusion of the trial court.

The order entered below is therefore *affirmed*.

3. SAME: interest of engineer: disqualification.