JOHN ELLIOTT, Appellant, v. COUNTY OF WOODBURY, ET AL., Appellees.

**Drainage:** JUDGMENTS: FORMER ADJUDICATION: PARTIES CONCLUDED.

1  A former judgment in favor of plaintiff on his cross petition against the plaintiff in this action, permanently enjoining this plaintiff, his agents or employees only, from interfering with the flow of water through a culvert within a proposed drainage district, was not conclusive against the county, in this suit to compel it to maintain the culvert. And even though the county had been enjoined in that action from interfering with the culvert, that fact would not prevent it from thereafter establishing a drainage district and dispensing with the culvert; as the county is expressly authorized to establish drainage districts and to make changes in the ditches, drains and laterals, for which plaintiff's remedy was to object before the board of supervisors, and failing there to make his claim for damages.

**Drainage:** ESTABLISHMENT OF DRAINS: PROCEEDINGS: EVIDENCE. In

2  this action to enjoin the county from maintaining an embankment and to compel it to keep an open culvert therein for the drainage

of plaintiff's lands, the reports and plats of the engineer, resolutions and proceedings of the board and the evidence in the case are reviewed and held to show that a culvert in the embankment, as claimed by plaintiff, was not contemplated in the establishment of the district.

*Appeal from Woodbury District Court.*—HON. WM. HUTCHINSON, Judge.

THURSDAY, OCTOBER 23, 1913.

ACTION in equity to enjoin the defendant county, its board of supervisors and an engineer in charge of the work in a drainage district, from maintaining a solid embankment along the south side of a highway adjoining plaintiff's land, and for a mandatory injunction compelling the defendants, or allowing plaintiff, to put in a culvert across the highway and through the embankment in order to re-establish what is claimed to be a natural water course, so as to drain the water from his (plaintiff's) land. The defendant pleaded that the embankment complained of was a part of the work necessary to the establishment of a drainage district; that the plans of the engineer contemplated the erection of the embankment and the taking out of the culvert, and that the district, as planned and established, contemplated this change; that plaintiff's remedy, if he ever had any, was to file a claim for damages, or to object to the establishment of the district as planned. The plaintiff denied that the district was planned or established as claimed, and pleaded that the plans contemplated the maintenance of a culvert at the point in question. On these issues, the case was tried to the court, resulting in a decree dismissing plaintiff's petition, and plaintiff appeals. —*Affirmed.*

*Henderson & Fribourg,* for appellant.

*A. C. Strong* and *Jepson & Jepson,* for appellees.

DEEMER, J.—Although many propositions are argued, the real questions in the case are of fact, and it is practically conceded that if in the establishment of what is known as the "Garretson Drainage District" the plans as finally adopted contemplated and did, in fact, provide for the closing of the culvert in question and the substitution of a solid embankment and the conveyance of the water, which originally went through a culvert southward from plaintiff's land, by a lateral ditch eastward into the main ditch of the district, plaintiff has no right to recover. If, however, the contrary appears, then the decree is wrong and should be reversed.

Before the establishment of the drainage district, in an action brought by one Manley against the plaintiff, the board of supervisors of Woodbury county and others, plaintiff, on a cross-petition filed by him, obtained a decree against Manley, his agents and employees, permanently enjoining them from interfering with the natural flow of water through the culvert, which plaintiff herein is now seeking to maintain, or from filling up the channel or the culvert crossing the same. No decree was rendered, however, against any of the other parties to that action, and none was asked against the defendant county or its board of supervisors. We may assume that this decree established *prima facie* plaintiff's rights; but it was not conclusive upon the county.

1. DRAINAGE: judgments: former adjudication: parties concluded.

Conceding that it was at the time conclusive as to every one, still this would not, in any way, affect the right of the county to thereafter establish a drainage district, which would dispense with the culvert, even though the plan were not a good one and the final effect of it would be to flood plaintiff's land. His remedy in such a case would be to appear before the board and object to the plan, and if this was unavailing, to file and establish his claim for damages. *Wallis v. Harrison County,* 152 Iowa, 476; *Loveless v. Ruffcorn,* 143 Iowa, 221. The drainage law expressly provides that the board, in establishing drainage districts, may make changes in ditches, drains

or laterals, as it may be advised upon plans and recommendations of the engineer appointed by it. See Code, Section 1939; Code Supplement, Section 1989-a11; Acts 33d G. A., Chapter 118, Section 10; Acts 34th General Assembly, Chapter 87, Section 4.

Plaintiff's land, and all lying immediately south and east thereof, was included in the proposed Garretson drainage ditch or district, and the plans contemplated the enlargement of an old ditch, and the construction of many laterals, running into it from the west, including one just south of plaintiff's land, the embankment of which is now complained of.

2. DRAINAGE: establishment of drains: proceedings: evidence.

These laterals were on the south side of each section of land, in the district, commencing with the one complained of, known as "A" down to and including one known as "N."

The petition for the drainage district contained the following requests:

The undersigned petitioners, therefore, request your honorable body to establish a drainage district embracing the said lands above described, and any other land found necessary or expedient, and to locate, establish, and construct the Garretson ditch and such lateral ditches as may be found necessary or expedient, of sufficient size and capacity to drain all the land within said drainage district and to protect the same from overflow, and that said main ditch and laterals be substantially as follows:

### Main Ditch.

Commencing in the Garretson ditch and about twenty (20) rods north of the north line of section five (5), etc., . . . cleaning and enlarging said Elliott creek and Garretson ditch as at present located to sufficient capacity to meet all requirements of drainage and overflow protection. . . .

### Lateral A.

Commencing at or near the quarter corner on the section line between section thirty-one (31), township eighty-eight (88), range forty-six (46) and section six (6), township

eighty-seven (87), range forty-six (46), and extending eastward to the main ditch.

### Lateral B.

Commencing at or near the quarter corner on the section line between sections six (6) and eleven (11), township eighty-seven (87), range forty-six (46), and extending eastward to the main ditch.

[Here follow locations of laterals C, D, E, F, G, H, I, J, K, L, M, and N.]

Wherefore your petitioners pray that the proper legal proceedings to be taken to procure the establishment of said Garretson ditch district and the establishment and construction of the said Garretson ditch, together with such of the above, and other laterals as may be found necessary and expedient, and that said ditch and laterals be so established and constructed as to best subserve the purpose of draining said lands and protecting the same from overflow.

An engineer was appointed, and he made a report, from which we extract the following:

I beg leave to report that I have made an examination and survey of said drainage district, and hereby submit the plat, profile, and report of said survey in compliance with the drainage laws of the state of Iowa, the said plat and profile showing ditches, drains and other improvements, the course and length of the drain or drains through each tract of land, and the elevation of all ponds and deep depressions in said district, there being no lakes therein, and the boundary of the proposed district, which includes therein all lands which would be benefited by the proposed improvements and the description of each tract of land therein, and the names of the owners thereof as shown by the books in the auditor's office, together with the probable costs of said improvements. I would recommend that a main ditch with a system of laterals be established, constructed upon the following routes: [Here follows route of main ditch, being same route as shown by engineer's plat, Exhibit 2, and descriptions of laterals B, C, D, etc., down and including P, saying nothing, however,

of lateral A. Then comes this from the report:] The excavation from the east and west lateral should be placed on the south side, thus making good graded public highways, and in all cases eliminating the possibility of the flood water from the north flowing onto the land lying south; on the other laterals it should 'be distributed on each side. . . . Allowance has been made in the estimate of the lateral ditches for any road or other ditches now existing.

Thereafter the engineer made an amendment to this first report, from which we extract the following:

Now comes Martin Holmvig, engineer, and upon request of the board of supervisors of Woodbury county, Iowa, and, upon further examination and consideration of the matters involved, makes this an amendment to his former report, filed herein on September 15, 1909, to wit:

That the following change is reported as made in the location of the main ditch, the channel of same to run as follows: [Here follows some changes not necessary to be quoted.] That lateral A to said ditch shall be constructed as follows:

### Lateral A.

Commencing at a point where the main ditch intersects the south line of section 32, township 88, range 46; thence west along the small ditch already constructed to the center line of section 31, township 88, range 46.

And I would also recommend that part 2 of lateral B running north and south through section 6, township 87, range 46, be abandoned.

Thereafter the board of supervisors met in regular session and adopted the following resolution:

First. That the petition filed in said matter is sufficient in form and matter, and the said board of supervisors have full and complete jurisdiction of the matters involved.

Second. That Martin Holmvig, county surveyor of Wood-

bury county, Iowa, was duly appointed engineer for the purpose of locating said ditch and establishing the said drainage ditch, and he as such engineer having made and properly filed a report of his preliminary survey establishing said drainage district and locating said ditch, and he also having this day filed an amendment to said report, slightly changing the route thereof at certain points, and the hearing of said report as amended coming on before this board, the board adopts his report as amended.

Third. That full, due, complete, and proper notice, as required by law, had been served upon the owner of each tract of land or lot within said proposed drainage district, as shown by the transfer books in the auditor's office of said county, and also upon all persons in actual occupancy of said land or lots, and upon each lienholder or incumbrancer of any land through which or abutting upon which the proposed improvement extends, as shown by the county records, the same being a notice of the pendency and prayer of said petition and the favorable report thereon by the engineer, and that said report might be amended at any time before final action, and the day set for the hearing of said petition before the board of supervisors, and that all persons interested in said proceeding have been duly and legally served with notice of the hearing on said petition, as provided by law.

Fourth. That Martin Holmvig, the engineer appointed by the board of supervisors for that purpose, has surveyed said improvement, and has filed his report and amendment thereto in the office of the auditor of Woodbury county, Iowa, containing all the provisions required by law to be made and contained in such report.

Fifth. That the said improvement petitioned for is conducive to the public health, convenience, and welfare, and is for the public benefit and utility, and the said drainage district and the said Garretson ditch, as prayed for in said petition, and as recommended by said amended report of said engineer, are hereby determined to be a necessity.

Sixth. That claims for damages by reason of the location of said improvement having been filed, further proceedings herein are continued until the 4th day of April, 1910, at 2 o'clock p. m., the same being the April session of the board of supervisors of Woodbury county, Iowa, for the purpose of hearing and determining all claims for damages, said ses-

sion to be held in Sioux City, Woodbury county, Iowa, at which date the matter will again be taken up and considered by said board.

Seventh. That the county auditor appoint three appraisers to assess such damages as may be sustained by claimants, as provided by law.

At the April session, the board again met and passed a resolution and order, from which we extract the following:

[After reciting prior proceedings and the appointment of an engineer, it proceeds], . . . That on the 6th day of April, A. D. 1910, the board of supervisors, after a full hearing, determined the amount of damages to which each claimant was entitled, and duly rejected the claims of all claimants for damages who, in the opinion of said board, were not entitled to recover damages. That all provisions of law, in regard to the location and establishment of said drainage district and improvements had been fully and in all respects complied with, and said board of supervisors had full and complete jurisdiction over said drainage district, the improvements therein recommended, and all parties interested therein, and have fully considered and determined the amount of damages to be allowed, and the time for final action has arrived: Therefore be it resolved and ordered, that the Garretson drainage district and the main ditch and laterals and improvements recommended by the engineer appointed by said board, in his report, and the amendment thereto filed in the office of the county auditor of Woodbury county, Iowa, and in accordance with the plats and profiles of said engineer, be and the same are hereby located and established in accordance with the reports and recommendations of said engineer; the damages awarded and the expense of the improvement not being excessive, nor a greater burden than should be borne by the land benefited by the improvement. The main ditch commencing 595 feet east of the southeast corner of section 31, in township 88, range 46, thence in a south and southeasterly direction and terminating near the southeast corner of section 6—86—45.

We here attach the engineer's plat, filed with his report,

and have noted thereon, with a cross, approximately the point
on Lateral A where plaintiff claims a culvert should be main-
tained.

This plat also gives, in small figures, various elevations
and shows the Garretson ditch, and the laterals at the south
of each section line. Defendant Skeels was constructing engi-
neer in charge of the work, and on December 11th he filed the
following with the board of supervisors:

To the Board of Supervisors of Woodbury County, Iowa.
Gentlemen: Lateral A of the Garretson ditch and drainage
district has been constructed by the Canal Construction Com-
pany. There is a road adjoining this ditch on the south, and
the dirt excavated from this ditch was, as directed by me, the
engineer in charge, placed as a solid dike on the south of said
lateral and in the road. That the best interests of this drain-
age district will require that lateral A and the other laterals
in this drainage district, running east and west, be constructed
with solid dikes on the south of each. That I am informed
that the dike on the south line of lateral A has been cut
through and a culvert inserted. · That the effect of cutting
this dike and the placing of a culvert therein is to impair the
usefulness of said lateral, and will divert the overflow through
said cut over land over which it would not flow with said
lateral and dike in the condition it should be. That said
lateral A, if constructed with a solid dike on the south, is
amply sufficient to care for the water which will reach the
same.

And on the same day the board passed the following
resolution and order:

Be it resolved and ordered by the board of supervisors
of Woodbury county, Iowa, That whereas Lateral A of the
Garretson ditch and drainage · district was constructed in
accordance with the contract and specifications, and under
the supervision of G. Y. Skeels, the engineer in charge, and
as directed by him, as shown by his report filed herewith;
and whereas, said lateral was constructed and the dirt ex-
cavated therefrom was placed in the road immediately south
of said ditch, forming a solid dike on the south side of said
ditch over which a public highway is constructed, and which
solid dike is, in the opinion of said engineer, for the best
interests of the drainage district in the manner in which the
same was constructed under his supervision; and whereas,
since the excavation of said lateral A, and the making of said
dike and embankment, as a part of the public highway on
the south side thereof, some party, without authority from
said engineer or from the board of supervisors, has cut through
the dike and embankment on the south line of said ditch and
placed a culvert therein, impairing the usefulness of the said

lateral A, which is sufficient to care for the water which will reach the same: Now, therefore, be it resolved and ordered that G. Y. Skeels, the engineer in charge of the construction of the improvements in said drainage district, be and is hereby directed and ordered to remove said culvert and to fill up the cut in said dike and embankment, so that the said road and the dike and embankment which is a part thereof, shall be of a uniform height, said work to be done as directed by said engineer and at the expenses of said drainage district.

After some notices to the board, plaintiff commenced this action, basing his action originally upon the decree rendered in the Manley Case, to which we have referred, but finally alleging:

That the original plan of the Garretson ditch and the laterals thereof, as reported by the engineer in charge of the formation of said drainage district, recognized the existence of the said culvert and public water course across the public highway near the southwest corner of the plaintiff's real estate, and provided for the continuance and maintenance of said culvert and public water course in the public highway and over and across the lands adjacent to said public highway on the north and south of said highway. And the said ditch and drainage district were established by the board of supervisors, under the report of the said engineer, with the said culvert and water course in existence upon the public highway, and in no manner provided for the taking out of said culvert, or wrongfully filling up of the channel of said public water course, where it crosses the public highway. And G. Y. Skeels, engineer thereafter appointed to supervise the construction of said Garretson ditch and laterals, and the board of supervisors in overseeing the construction of said ditch and laterals had no right, power, or authority to change the original plan of said ditch and laterals, as established, laid out, and reported by the original engineer. That the said G. Y. Skeels, in closing up the said culvert, acted without authority, and thereby changed the original plan of the construction of the said Garretson ditch and laterals, as established by the board of supervisors. That the defendants herein, and the board of supervisors of Woodbury county,

Iowa, in passing a resolution directing the taking out of the said culvert, and the making of a solid embankment across said public water course in said highway acted wrongfully, and without authority, and thereby sought to and did change the plan of the said drainage district and ditch and laterals as reported by the original engineer, and as established by the said board of supervisors.

Many other matters were alleged, but as we view it, this presents the only real issue in the case. On the face of the records, we are constrained to say that neither the reports and plats of the engineer, nor the resolutions of the board of supervisors, contemplated that there should be a culvert in lateral A, as claimed by plaintiff. Indeed, the contrary quite conclusively appears, and it is manifest that if an old water course, as claimed by plaintiff, was to be maintained, the plat or the report of the engineer would have shown it. None of the records contain any intimation of this kind. On the contrary, they show that all the laterals should be placed on the south side and the excavations thrown to the south, in order to make a good graded public highway, and eliminating the possibility of water from the north flowing on the land lying south. The plat, as we have observed, shows no culvert in lateral A, and makes no exception to the rule to be applied to the other laterals. Plaintiff, however, relies upon the fact that the lateral A will not keep the flood waters off his land, and that a floodgate has been put in at the junction of this lateral with the Garretson ditch, and the further fact that the engineer's plans, if they be as defendants contend, are bad; for the reason that the surface of the ground is something like three or four feet higher at the Garretson ditch than at the place where he claims the culvert should be. Plaintiff also relies upon statements claimed to have been made to him by the engineer about the time he concluded to establish lateral A and abandon part of lateral B, to the effect that the culvert was not to be disturbed. He also relies upon statements made to him by individual members of the board after the estab-

lishment of the district, to the effect that they did not intend to take out the culvert; one of them saying: ". . . It was not an action of the board that the board would have no right to take out the culvert because there was an injunction against it; and he said no action had been taken, nor anything done before the board." And another ". . . said he knew nothing about it coming out, and in fact he did not know there was a culvert there. He said there was no action of the board." Thereafter, according to the plaintiff's contention, he went before the board in session, and although the two members mentioned stated that they had given no instructions to the constructing engineer to take the culvert out, the board refused to do anything, but on the contrary, received the report of the constructing engineer and passed the resolution heretofore quoted.

One of the members of the board, with whom plaintiff claims to have talked, was absent in Europe at the time of the trial, and his testimony was not taken. The other, with whom plaintiff says he talked, testified:

. . . It was stated that lateral A should have a floodgate at the east end. Mr. Wiley was to put that in, it was the only one in the district to keep the water from backing up on Mr. Elliott's land. I understood that all the laterals were to be solid dikes all over the district; the dirt was to be put on the road to form a dike and better the roads and keep the overflow from above from coming down over the land below it. I never heard any talk before the board that lateral A was not to be constructed with a solid dike on the south. When I voted for the establishment of the district I understood that the laterals should all be solid. It would simply not amount to anything if they had the dikes all open. The drainage system would not be efficient to protect against overflow. I would not have voted for the establishment of lateral A if I had understood there was to be an opening in the dikes. The first I heard of a demand made by Mr. Elliott for a culvert south of lateral A, if I remember, was the time when Mr. Elliott came down there and asked me if I had ordered the engineer to fill up that culvert. I told him that

I did not order the engineer to fill it up, that I thought it was the engineer's scheme—that all those dikes should be solid; that was left to the engineer, we appointed him for that purpose. . . . I told Mr. Elliott that I did not know there was a culvert there, and in fact I did not. I had not looked over the district very much. That was the first time I ever heard of a culvert being there, or of its being left in there or taken out. They took out the culverts all along down over the district wherever they built dikes along the roads; there were various culverts taken out.

Another member of the board testified:

. . . I heard Mr. Elliott say that he wanted a flood-gate in there, and my understanding was at that time that he would be satisfied with a floodgate in there. My understanding was that lateral A was to be constructed with a solid dike on the south, the same as all other laterals. That was my understanding at the time I voted for the establishment of the drainage district, including lateral A, and from the reports of the engineer. I heard no talk by the members of the board that the culvert just south of lateral A was to remain. I remember the circumstances of the resolution being passed by the board last fall, ordering the culvert taken out and the dike filled up. That was done because it was the general understanding, and the engineer recommended it. The upper end of the drainage district would not be efficient with a culvert in there. I am talking about Mr. Elliott. I think it would certainly drain off water quicker if there was a culvert in there, but I think it would spoil the system, especially so if other people demanded the same right. The object was that this lateral should gather the water from north of it, and force it into the Garretson ditch, and this was true of all the east and west laterals.

Plaintiff's main reliance, however, is upon the testimony of the engineer appointed by the board in the first instance. After referring to his report, from which we have quoted, he said:

. . . The two reports, Exhibits C and D, did not

provide for the taking out of the culvert in the highway south of lateral A. In making Exhibit B I did not have any intention, nor did the board, so far as I know, of removing the culvert in the highway adjoining lateral A. Exhibits C and D did not speak of a floodgate, but it was my intention and purpose to put in a floodgate; but it was not talked over with the board. The surface of the ground at the Garretson ditch adjoining lateral A is about four feet higher than immediately north of the culvert in the road. In my judgment as an engineer under the conditions on the land of Mr. Elliott, I would not do it, and I do not think it would be the best plan to put in lateral A with this floodgate and take out the culvert in the public highway. . . . My first report did not refer to lateral A in any way, shape, or manner. I did not understand my second report, or the two reports together, to provide for any solid dikes in the road south of the lateral A. I would not as an engineer, knowing conditions there, have reported to the board to make that roadway south of lateral A a solid embankment. I made my second report, putting in and deepening lateral A at the request of the board of supervisors. The deepening of lateral A would take a little more water than before, of course, but when the high water comes it can't get into the Garretson ditch there; that is all there is to it. There is no other place in that territory or district where like conditions exist with reference to an east or west lateral. Exhibit 2 is the plat filed by me along with my first report. . . . My first report provided for a lateral to run down through section 6 immediately east of the Farmers ditch to connect with lateral B. That was asked to be taken out, I think, at the request of Wiley and Sargisson. If I had it to do over again now, with the experience I have had in this and other ditches, I would not let anybody get me to take out the lateral through section 6 immediately east of the Farmers ditch. (On cross-examination, he said:) I don't think I ever explained my first report to the board of supervisors in the same language as I have explained it today to the court. I think the board had to take my report as speaking for itself. . . . The fact is that the grade there with the ditch on each side would make it higher and dryer. I did amend my report, providing for lateral A, but I would not do it again. I knew that my report was for the guidance of the board, and expected them to establish lateral A. Q.

So the only fault that you now find is that you think your judgment was in error and you wouldn't do it again? A. Well, I was a little weak-kneed; that is all. The object of lateral A was to take care of the water from the north, or from Amick's land, and up in there. I knew there was a culvert about 450 feet east from the quarter corner between sections 5 and 6, and knew that the water from the north flowed down through that culvert. The object of lateral A was to take care of as much of that water as it could. . . . I expected some water to flow through lateral A, but I expected that culvert to stay in. I expected the water that went down through that culvert to go down its own way over the lower land. In my report to the board of supervisors, I did not mention the culvert one way or the other, for the simple reason that there was a court ruling against that culvert coming out. My report provided for solid dikes on the south of all other east and west laterals, but this lateral was not there, and that report had nothing to do with it. Afterwards I filed an amended report, providing for another east and west lateral. I thought that it would take care of itself, because there was a court ruling against taking it out. I thought the board knew about it. Q. Well, why didn't you make some provision for the waste dirt in lateral A. A. Well, common sense would tell you to throw it in the road. The swale or slough that ran through where that culvert was ran through section 6, and crosses the south line of the west half of section 5 about the middle. That swale was the natural water course that went through the culvert. I did not provide for a culvert in lateral B where that low place was because there wasn't enough of it. In regard to the lateral, I heretofore testified in the appeal from the assessments of benefits: 'It would keep the water that came through that culvert from spreading over the land.' That answer is misleading. It could not keep the water that goes through the culvert from spreading; it couldn't do that, you know. The water would run through the culvert and spread over the Manley land south of it. Lateral A would keep some of the water from going through the culvert. I remember being asked: 'Will the deepening of that east and west ditch along Mr. Elliott's south line assist in draining off his land, getting the water off?' to which I answered: 'Yes, sir; it would help some, because it would give a better chance to run off after the

water goes down in the ditch.' And the thought in constructing lateral A with a floodgate was that when the water went down in the Garretson ditch it would run off much faster through this lateral.

There was an appeal by plaintiff from the assessment of benefits to the land, and on that appeal the engineer was a witness. On the trial of the present case, in addition to the testimony given above, he stated:

At the time of my testimony in the appeal from the assessment of benefits, I didn't take into consideration the fact that this flood water was to run through the culvert, but took into consideration that it was to run through lateral A, and if the water was so high in the ditch that it would not run out during that high water, that it would run off quickly after the water in the Garretson ditch did receive it, but, of course, before the water in the Garretson ditch had a chance to go down I expect some of the water would go down through Manley's land anyway. As to whether it would go down through there if there was a dike would depend—it would take quite a dike sometimes to keep it from going down through there—I mean it would take a good high dike sometimes to keep the water from going down over Manley's land. The height of the dike would not have to be higher than the water would rise, but the strength of the dike would have to be increased. If the water was higher at the point where this culvert was than it was in the ditch proper, then I expect it would flow into the ditch through the lateral and through the floodgates, regardless of the fact whether the gate was eight or ten feet under water or not—some of it would go through if there was pressure enough to make it go through. A body of water that would rise to the height of that dike would perhaps have pressure enough to run through that lateral if the water in the ditch was not higher than it was in the lateral.

In addition to this, there is other testimony from the witness, tending to show that, on the trial of the appeal from the assessment of benefits, he had in mind that the culvert was to

be removed, and that his plats and reports so showed. For this and other reasons, his present testimony, in explanation of his reports and what he intended by them, is not entitled to great weight, even, if permissible as against the reports themselves.

This is the substance of the entire record in the case, save some testimony as to the inefficiency of the plans as recommended by the engineer and adopted by the board; and it is manifest, we think, that the decree must be affirmed.

A significant fact in the testimony is that when the matter of plaintiff's appeal from the assessment of benefits was being heard, the engineer who now explains his plans, etc., testified that no culvert was to be put in the embankment formed by the construction of lateral A, and doubless this was the theory on which plaintiff presented his appeal. He cannot now change and claim that the embankment was not to be solid, but that a culvert should have been left in the road.

Moreover the burden of proof is upon the plaintiff to establish the affirmative issues tendered by him, and we are of opinion that the records, reports, plats, resolutions, etc., show that lateral A was to be constructed as all others—with a solid embankment on the south side, which would tend toward making the highway more passable. It is hardly possible that the engineer intended to have a culvert in the road and to have the water spread out over adjoining land to the south, or to be taken care of by a ditch leading to the next lateral south, without disclosing that fact. Indeed, the Manley land shown on the plat to the south of that owned by the plaintiff would not have been drained, if the water, coming down from plaintiff's land, were collected at a culvert across the road and discharged upon his land, either to spread out thereon or be take care of in some other manner. No other manner is indicated on the plat, and if the engineer contemplated such a discharge upon the Manley land, he would surely have formulated some plan of taking care of it. That he did not do so is full of significance. Doubtless benefits were assessed against Manley on the theory that his lands were to be

benefited by lateral A taking care of the waters to the north. Indeed, the record tends to so show; and it would be unjust and inequitable to now construct a culvert so as to throw the waters coming from plaintiff's land to the north upon the lower land after an assessment on another theory.

The trial court heard the wittnesses and arrived at the conclusion that plaintiff was not entitled to the relief prayed, and we see no reason for interfering with the decree.

It is therefore *Affirmed.*

WEAVER, C. J., and PRESTON and WITHROW, JJ., concurring.